UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID MARK FRENTZ, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 1:13-cv-1311-TWP-DKL |
| ) | |
| RICHARD BROWN, ) | |
| ) | |
| Respondent. ) | |

**ENTRY DENYING PETITION FOR WRIT OF HABEAS
CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This matter is before the Court on a Petitioner David Mark Frentz's ("Mr. Frentz") Petition for Writ of Habeas Corpus. In 2006, Mr. Frentz was convicted after a jury trial in an Indiana state court of murder and drug-related crimes. Following numerous state court proceedings, Mr. Frentz now seeks a writ of habeas corpus from this Court. For the reasons explained in this Entry, the Petition for Writ of Habeas Corpus is **DENIED** and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

## I.    BACKGROUND

Following a jury trial, Mr. Frentz was found guilty of murder, possession of methamphetamine while possessing a firearm, possession of cocaine while possessing a firearm, and possession of over thirty grams of marijuana. The trial court sentenced him to an aggregate term of fifty-nine years' imprisonment. His convictions and sentence were upheld by the Indiana Court of Appeals. *See Frentz v. State*, 875 N.E.2d 453 (Ind. Ct. App. 2007) ("*Frentz I*"). Following this, the denial of post-conviction relief was affirmed. *See Frentz v. State*, 989 N.E.2d 383, 2013 WL 2405197 (Ind. Ct. App. 2013) ("*Frentz II*"). The Indiana Supreme Court denied transfer of *Frentz II*. *See Frentz v. State*, 992 N.E.2d 207 (Ind. 2013).

A federal habeas court "presume[s] that the state courts' account of the facts is accurate, unless the petitioner rebuts this presumption 'by clear and convincing evidence.' 28 U.S.C. § 2254(e)(1)." *Caffey v. Butler*, 2015 WL 5559399, *1 (7th Cir. Sept. 22, 2015). The facts underlying Mr. Frentz's offenses and the prosecution were summarized by the Indiana Court of Appeals:

> The facts most favorable to the jury's verdict indicate that twenty-three-year-old Zackary Reynolds lived with the fifty-three-year-old Frentz and worked on his Orange County farm. On Saturday, January 22, 2005, Frentz's doctor told him that he would die if he did not stop drinking. Frentz had been drinking for thirty years and quit "cold turkey" that day. Frentz's doctor gave him pills to alleviate "the DT's[.]" On Sunday, January 23, Frentz ran some errands, came home to work on a pickup truck with Reynolds, and then ran additional errands. On his way home, Frentz stopped at a fast-food drive-through in Salem between 10:00 and 11:00 p.m. While there, he talked on his cell phone with his friend Carl Brock. Frentz told Brock that he had been "feeling bad" and had been hallucinating, with "either light poles or salt shakers dancing or something like that, uh, dogs running across the road laughing at him and stuff like that." Brock became concerned and asked Frentz to call him when he got home.
>
> Brock went online for an hour or two, thereby tying up his telephone line. Brock then called Frentz's cell phone. Frentz asked both Brock and his wife if they had heard from his ex-girlfriend, Dusty Austin, with whom he had broken up several weeks earlier. . . . During the course of the conversation, Frentz went from "feeling ill and hallucinating to someone who was very sober and [not] really talkative at all." In an attempt to smooth things over, Brock made some humorous remarks. Frentz hung up. Brock believed that Frentz had "snapped" and tried calling him several times, to no avail.
>
> . . . At approximately 3:30 a.m., Brock finally reached Frentz by telephone. Frentz was "freaked out" and told Brock to call the police. Frentz told Brock that "he put PCP in that shit and people [are] up here to fuck with us." Frentz "said something about [who's] out there, get back in here, who broke that light." Frentz "kept hollering" at Reynolds, but Brock never heard Reynolds reply. Brock offered to pick up Frentz, and Frentz agreed. When Brock asked to talk to Reynolds, Frentz hung up. As Brock got dressed, his wife called Frentz and asked to talk to Reynolds. Frentz hung up again. Brock then called a phone number that Austin had given him after breaking up with Frentz. Woolsey answered the phone. Brock told Woolsey to tell Austin that Frentz had "snapped." Brock's wife refused to let Brock go to Frentz's home.
>
> Early that morning, two of Frentz's neighbors saw and heard what appeared to be

Frentz's pickup truck driving down the road at a high rate of speed. At approximately 5:30 a.m., Frentz called 911 on his cell phone and stated that several people were trying to break into his house. The phone line went dead several times during the course of the call. Frentz reported that the intruders had broken into the house, that one of the intruders was shooting, that his friend had been shot in the chest, that his friend was still breathing, that the intruders were still in the home, that the intruders were "trying to get in the windows" and doors, and that he had "locked the door back." The call ended when the operator confirmed with Frentz that assistance had arrived.

Officers from Washington and Orange Counties responded to Frentz's 911 call. None of them observed any vehicle or foot traffic or anything unusual on their way to Frentz's home. They saw Frentz standing in the kitchen. Appearing disoriented and agitated, Frentz opened the door and motioned for them to come in. One of the officers saw an SKS assault rifle lying on a kitchen chair and "secured it" for their safety. . . . Another officer handcuffed Frentz, who was dressed in underwear and a t-shirt and was "sweating really bad." Frentz told the officers that Mexicans on motorcycles had broken into his house and that there was someone in his bed. The officers found no one in Frentz's bed and no signs of a struggle or forced entry.

From the kitchen, a third officer saw Reynolds lying face-up in a hallway in a pool of blood, on top of a loaded .22-caliber rifle. Reynolds's body was cool to the touch and showed no signs of life. He had been struck by three bullets . . . . The two chest wounds exhibited stippling from gunshot residue, which indicated that the firearm's muzzle had been within two feet of Reynolds when the bullets were fired. All the wounds were lethal, and Reynolds bled to death within minutes. A toxicology exam revealed traces of methamphetamine and amphetamine in Reynolds's blood. A ballistics test established that the bullet that lodged near Reynolds's spine was fired from the SKS. Genetics testing revealed traces of Reynolds's DNA on Frentz's t-shirt. In the hallway, police recovered four shell casings of the same caliber as the SKS. Three bullets had penetrated the closet door in front of which Reynolds had been standing when he was shot. Police noticed that Reynolds's bedroom window had been shot through several times from the inside and found similar shell casings nearby.

Orange County Sheriff's Detective Michael Dixon arrived . . . . Frentz stated that he had been asleep in his bedroom and heard a scuffle at the other end of the house. He grabbed the .22, walked down the hallway, and saw two Hispanic men exiting the back door. Frentz saw Reynolds fighting with a third Hispanic man over the SKS. Frentz set the .22 down, grabbed the intruder, and heard two gunshots. The intruder left the home and drove away with his companions in a sport utility vehicle. Frentz stated that the three men had broken into his home through a window.

Thereafter, Indiana State Trooper Bill Flick transported Frentz to Detective Dixon's office for an interview. Frentz read and signed an advisement of rights form. Frentz told Trooper Flick that when he went to bed at 11:00 on Saturday evening, Reynolds

was playing cards and drinking beer with two unknown young white men at the kitchen table. Between 4:30 and 5:30 a.m., Frentz heard Reynolds yell and saw three Hispanic men, two of whom went out the back door. Frentz grabbed the .22, called 911, and went into the hallway, where Reynolds was scuffling with the third intruder over the SKS. Frentz placed the .22 on the floor, grabbed the intruder, and heard a gun go off. The intruder went out the back door. Frentz heard a motorcycle and saw a black sport utility vehicle drive off. Frentz heard someone outside the house and fired shots through the window and out the back door.

At Frentz's home, police found marijuana in plain view and obtained a search warrant. Police found a total of 39.49 grams of marijuana . . . . Police also found cocaine residue in a one-hitter above the refrigerator, as well as methamphetamine residue on a mirror next to a rolled-up dollar bill in a kitchen cabinet. A toxicology exam revealed traces of ephedrine and cocaine metabolites in Frentz's blood. At trial, the court excluded Frentz's toxicology report pursuant to a motion in limine.

After further investigating the scene and questioning Frentz's mother, Trooper Flick and Detective Dixon interviewed Frentz a second time that same day. Frentz told the officers that he had stopped drinking "cold turkey" on Saturday after thirty years and had been given medication. He denied telling his mother that he was hallucinating and claimed that he had told her he felt "fuzzy" from the medication. Frentz stated that Reynolds had been "just outside of his door" when he was shot and that he remembered hearing three gunshots. He stated that he put his hands "over [Reynolds's] bleeding" at the urging of the 911 operator and that he loved Reynolds "like my boy." Frentz spent the night in the Orange County jail.

The following morning, Frentz asked to speak with Trooper Flick. Frentz told Trooper Flick that he had taken his medication the night before and experienced hallucinations. He stated that "it was like [the medication] was givin' [him] the DT's" instead of taking them away. He further stated that Reynolds had purchased drugs that weekend from someone who was interested in Austin, his ex-girlfriend. Frentz wondered if that person might have altered the drugs and persuaded Reynolds to "slip [him] some[.]" Frentz denied that his medication and any altered drugs he might have ingested might have caused him "to just randomly start shootin' that rifle[.]"

While in jail, Frentz discussed Reynolds's shooting with fellow prisoners and serial felons Troy Brackett and David Turner. Frentz told Brackett that A.J. Guthrie and Eric Lloyd had sold methamphetamine to Reynolds and then attempted to steal it back. During the ensuing struggle, Reynolds was accidentally shot. Later, Frentz told Brackett that he and Reynolds had argued about the drug purchase from Guthrie and Lloyd, who had bought the drugs from Woolsey, who was living with Austin. Frentz said that he heard a noise that night that "played to his role" and shot Reynolds with an SKS. Frentz told Brackett that Reynolds "shouldn't have been messing with [his] old lady."

4

Frentz told Turner that he had come home on Sunday evening to find Reynolds with Guthrie and Lloyd. Reynolds offered Frentz methamphetamine, which he declined. Frentz went to bed, then got back up and told Reynolds that it was not a good idea to have "all that meth" in front of Guthrie and Lloyd. Guthrie and Lloyd later broke in to steal the methamphetamine, resulting in a struggle that claimed 'were on a jury, he would convict Frentz. Later, Frentz told Turner that Woolsey and Austin had hired Mexicans to break into his home and kill him for his life insurance policy and that they had shot the wrong person. Frentz then told Turner that he had sent Reynolds to persuade Austin to return to Frentz's home. Reynolds was gone for a long time, and Frentz began to suspect that he and Austin were romantically involved. That night, Frentz looked out his window and saw Austin standing behind a telephone pole. He thought that she and Reynolds were going to run off together, which "ticked him off[.]" He grabbed a gun, confronted Reynolds, and shot him. Frentz realized that "he'd messed up pretty bad" and shot Reynolds twice more to kill him. Frentz said that he placed the .22 underneath Reynolds's body and drove his truck up and down the road several times to make the neighbors think "that they heard several vehicles leaving his place at a high rate of speed [.]" Frentz kept changing his story until he finally got Turner's approval.

Frentz offered to pay Brackett and Turner to drop .45-caliber shells outside his house and put pry marks outside the windows. He also told both men that his brother had entered his home and retrieved $700 in cash from his jacket pocket and an ounce of methamphetamine from his jeans pocket, which his brother flushed down the toilet. Frentz's brother and sister-in-law did in fact find over $600 in cash in Frentz's jeans pocket while cleaning his house after the shooting.

While in jail, Frentz received a letter from Reynolds's father with Reynolds's obituary and a sarcastic request to help pay the funeral expenses. Frentz threw the obituary on the floor and told Brackett that "if he was going to pay for [Reynolds's] funeral he would have never killed him." Frentz told Turner that Reynolds's relatives were "[m]oney-hungry son-of-a-bitches."

. . . .

Frentz's jury trial lasted from March 27, 2006, to April 10, 2006 . . . . In his opening statement, Frentz's counsel said, "[W]e agree with ninety-nine percent of what the State says, probably 99.9 percent of what the State says." Frentz's counsel acknowledged that there were no signs of a struggle on the night of the shooting and that the evidence did not support Frentz's version of events. Detective Dixon agreed with Frentz's counsel's statement that the physical evidence indicated that Reynolds "was shot outside of his door standing up, fairly quickly, and that [Frentz] seemed to be the only one in the residence[.]"

After the close of evidence, the State requested an instruction on the lesser-included offense of voluntary manslaughter. Frentz's counsel objected, arguing that there was no evidence of sudden heat to warrant such an instruction. Counsel then elicited

5

sworn testimony from Frentz that he did not want either side to request instructions on a lesser-included offense. The trial court found no serious evidentiary dispute as to the existence of sudden heat and denied the State's request for a voluntary manslaughter instruction. The jury found Frentz guilty as charged.

*Frentz II*, 2013 WL 2405197, at *1-5.

## II. APPLICABLE LAW

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a) (1996). Mr. Frentz filed his 28 U.S.C. § 2254 petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). His petition, therefore, is subject to AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997).

"Under the current regime governing federal habeas corpus for state prison inmates, the inmate must show, so far as bears on this case, that the state court which convicted him unreasonably applied a federal doctrine declared by the United States Supreme Court." *Redmond v. Kingston,* 240 F.3d 590 (7th Cir. 2001) (citing 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362 (2000); *Morgan v. Krenke*, 232 F.3d 562 (7th Cir. 2000)). Thus, "under AEDPA, federal courts do not independently analyze the petitioner's claims; federal courts are limited to reviewing the relevant state court ruling on the claims." *Rever v. Acevedo*, 590 F.3d 533, 536 (7th Cir. 2010).

"A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 131, 141 (2005) (internal citations omitted). "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding v. Sternes*, 380 F.3d 1034, 1043 (7th Cir. 2004) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## III. DISCUSSION

Mr. Frentz raises two ineffective assistance of counsel claims in his petition for a writ of habeas corpus. The Court will set forth the relevant standards governing such claims before addressing each in turn.

When addressing claims that were properly presented in the state courts for federal habeas review, the methodology for the court's analysis is this: the first step under § 2254(d)(1) is "to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Marshall v. Rodgers,* 133 S. Ct. 1446, 1449 (2013) (citing *Williams v. Taylor*, 529 U.S. at 412; *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). In proceeding with the analysis, a federal habeas court

> must determine what arguments or theories supported, or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].

*Harrington v. Richter*, 562 U.S. 86, 102 (2011). If a state court's decision "was reasonable, it cannot be disturbed." *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011) (*per curiam*).

The clearly established federal law at issue in this case as set forth by the Supreme Court is as follows: a defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* With respect to the performance requirement, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there

7

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 534 (quoting *Strickland*, 466 U.S. at 694).

When the deferential AEDPA standard is applied to a *Strickland* claim, the following calculus emerges:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is . . . difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*] at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at __, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.

**A.    Counsel's Opening Statement**

During his opening statement to the jury, Mr. Frentz's trial counsel stated that he agreed with 99%, or probably 99.9%, of what the State said in its opening. Mr. Frentz contends that this amounted to ineffective assistance of counsel. To evaluate Mr. Frentz's claim, the Court begins by setting forth Mr. Frentz's counsel's opening statement in full:

> Oddly enough we agree with ninety-nine percent of what the State says, probably 99.9 percent of what the State says. You all know this is Mark Frentz. You all know what he's accused of. You know there was such a person as Zackary Reynolds. You know that Mark owned the residence. You know that Mark had his friend, Mr. Reynolds, staying with him, that they were good friends, and you all know that Zackary Reynolds was killed, that he was shot by an SKS three times, as Mr. Minton said, boom, center, (inaudible), three times. We know exactly where he was shot. You will see in this trial what the residence looks like. You will see that there's a sliding glass door here where most people come in and out. When you drive in, the driveway comes on this side. Driveway comes on this side. People . . . if it'll work. People drive up, come in here. We know as Mr. Minton said, the physical evidence is going to tell us exactly what happened, the physical evidence. We know Mr. Reynolds was killed against that closet. We know that because of certain types of scientific type evidence. We know that because of something called

> blood spatter. We know that because a certain thing called stippling. Out of a gun comes a lot more than the bullet. Powder. Burnt powder comes out. So when it comes out, you can see a pattern from somebody and tell how far the gun was away from 'em. We know that. We can tell his position by the path of the bullet. A bullet, it will be testified to traditionally travels in a straight line, not a big surprise to people. So if you match up where the bullet went in a person and where it comes out of a person, like if it hits the closet, then you know what position they were in. Also, if a bullet hits you here and it hits you here, obviously you know how you were positioned. So we know how Mr. Reynolds was positioned and exactly where he was and how far the shooter was from him. And we know, like the State said, Mark gave a cockamamie, ridiculous version of what happened. Mark says Mexicans on motorcycles came down on me, broke in, that we struggled. Remember that's a significant issue. Mr. Minton mentioned it. The struggle could not have happened from the physical evidence. It's true Mark had no marks on him. It's true Mr. Reynolds had no marks on him consistent with a struggle. It's true that by the position of the body once again, by the path and things like that, that he was standing up, wasn't moving around. So we agree with the State. What we're going to ask you to do and I'm giving you an over view of what the evidence will be is exactly what Mr. Minton says, watch the physical evidence in this case, and it will tell you exactly what happened. What I'm telling you now in case you didn't catch it before, is Mark's version at that moment when the initial officers, when, uh, Deputy Combs comes, Officer Terrell come, they're the initial ones on the scene, when he tells them what happened, that is not supported by the physical evidence. When he sits down and talks to Trooper Flick, that is not supported by the physical evidence. It did not happen. Could not have happened. Your job in this case once you hear all of this physical evidence Mr. Minton wants you to look at and I'm begging you to look at, the question will be what does the physical evidence show me? Does it show me a knowing and intentional killing? Or does it show you something else? Thank you.

(Trial Tr. 783-85.)

The Indiana Court of Appeals addressed Mr. Frentz's claim on the merits, and it is therefore subject to review pursuant to AEDPA. In rejecting Mr. Frentz's claim, the Indiana Court of Appeals began by recognizing the *Strickland* standard governing ineffective assistance of counsel claims. *See Frentz II*, 2013 WL 2405197, at *6. It then reasoned that Mr. Frentz's trial counsel did not render deficient performance in his opening statement as follows:

> [Mr. Frentz's] trial counsel's opening statement was not a commentary on the reasonable doubt standard [as Mr. Frentz argues].

9

> Rather, in a case in which the State had overwhelming physical evidence against his client, *see Frentz I*, 875 N.E.2d at 474, Frentz's trial counsel sought to bolster his client's credibility with the jury by frankly acknowledging the weight of the State's physical evidence.  As we have recognized:
>
>> concession by an attorney to certain elements of a charge or even to an entire charged offense may at times constitute a reasonable trial strategy. For instance, concession to a particular fact or charge that is supported by overwhelming evidence may help enhance a defendant's credibility on the remaining issues at trial.
>
> *Christian v. State*, 712 N.E.2d 4, 6 (Ind. Ct. App. 1999). That strategy is all that is reflected by Frentz's counsel's opening statement. Frentz's attempt to spin those comments into a concession that he was guilty beyond a reasonable doubt is not persuasive. As the post-conviction court found: "Counsel . . . did not by his opening statement admit [an] element of the offense, concede reasonable doubt or relieve the State of the necessity of establishing its case." Appellant's App. at 49.
>
> Neither is it relevant that Frentz's trial counsel later testified before the post-conviction court that he could not recall the strategy for the opening statement.  We review the post-conviction court's judgment in light of the evidence most favorable to that judgment. *Lindsey*, 888 N.E.2d at 322. Frentz's argument is merely a request for this court to reweigh the evidence before the post-conviction court, which we will not do. *See id.*

*Frentz II*, 2013 WL 2405197, at *7.

Mr. Frentz argues that the Indiana Court of Appeals's decision was based on an unreasonable determination of the facts in light of the evidence presented and was an unreasonable application of *Strickland*, which entitles him to relief under § 2254(d)(1) and (d)(2). The Court will address each of these arguments in turn.

### 1. <u>The State Court's Factual Determination — § 2254(d)(2)</u>

Pursuant to § 2254(d)(2), a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "[A] state court decision involves 'an unreasonable determination of the facts' under § 2254(d)(2) only when the state court makes

10

an 'unreasonable error.'" *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) (quoting *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011)). The Court must give "great deference to state court factual findings"; under AEDPA, the Court is "required to presume a state court's account of the facts correct, and the petitioner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

Mr. Frentz contends that there is no evidence in the state court record to support the Indiana Court of Appeal's finding that his trial counsel's opening statement was meant "to bolster his client's credibility with the jury by frankly acknowledging the weight of the State's physical evidence." *Frentz II*, 2013 WL 2405197, at *4. In support of this, Mr. Frentz points to his trial counsel's testimony during the post-conviction proceeding that he had no strategic or tactical reason for using the 99.9% figure in his opening statement and, further, that his trial counsel never testified that his goal at opening was to garner credibility with the jury.

The problem with Mr. Frentz's argument—like many of his arguments that heavily rely on his trial counsel's testimony during the post-conviction hearing—is that the *Strickland* analysis "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110. Therefore, Mr. Frentz's § 2254(d)(2) challenge that there was no factual basis for the Indiana Court of Appeals's conclusion is based on the false premise that the evidence that may be considered is only the testimony of his trial counsel. In fact, *Harrington* reveals that the opposite is true: the court must determine whether counsel's performance was objectively reasonable based on counsel's conduct, regardless of whether counsel's subjective strategy was reasonable or not. *See id.* at 109-110; *see also McAfee v. Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009) (noting that trial counsel's "reflection after the fact [at a postconviction hearing] is irrelevant to the question of ineffective assistance of counsel");

*Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) (*en banc*) ("Because the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits that his performance was deficient matters little."). This is precisely what the Indiana Court of Appeals did in evaluating the content of the opening statement. Mr. Frentz's § 2254(d)(2) challenge premised on a lack of evidence supporting the Indiana Court of Appeals's conclusion is therefore misguided and must be rejected.

    **2.**    **The State Court's Application of Strickland — § 2254(d)(1)**

The same principle discussed above from *Harrington* reveals that Mr. Frentz's § 2254(d)(1) challenge is equally unavailing. To be entitled to relief under § 2254(d)(1), Mr. Frentz must show that the Indiana Court of Appeals unreasonably applied *Strickland*. *See* 28 U.S.C. § 2254(d)(1). He argues that this occurred when the court construed his counsel's 99.9% comment as a strategy to bolster credibility when it was actually a concession that there was no reasonable doubt as to his guilt.

The Supreme Court has held that it is error for a court evaluating a *Strickland* claim to "dismiss strategic considerations [that could explain counsel's performance] as an inaccurate account of counsel's actual thinking." *Id.* at 109. Mr. Frentz asks this Court to make the same error. The Indiana Court of Appeals did not need to ground its conclusions regarding strategy in "counsel's actual thinking," but instead had to evaluate the "objective reasonableness of counsel's performance." *Id.* at 109-110; *see Williams v. Trammell*, 782 F.3d 1184, 1201 (10th Cir. 2015) (holding that there is no need for a hearing to examine the petitioner's counsel because the Court's "concern is the *objective* reasonableness of the lawyer's conduct—not the lawyer's *subjective* reasoning"). Indeed, the *Strickland* analysis requires a court to "affirmatively entertain the range

of possible reasons [the petitioner's] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011).

Again, this is precisely what the Indiana Court of Appeals did. It examined the opening statement as a whole and concluded that it represented sound strategy given the information known to counsel about the case, and that it was not a commentary on the reasonable doubt standard. As the Indiana Court of Appeals pointed out, concession of certain facts can be a reasonable strategy in that it can bolster the counsel's and thus the defendant's credibility in front of the jury. This is especially true when defense counsel faces "overwhelming physical evidence against his client," as the Indiana Court of Appeals found was true here. *Frentz II*, 2013 WL 2405197, at *7.

Mr. Frentz's trial counsel was faced with confronting physical evidence that made it nearly indisputable that his client killed Mr. Reynolds, and further still, was faced with his client's inconsistent and ever-changing explanations for what occurred. His counsel undoubtedly had a mountain to climb at trial. He sought to do so at least in part by gaining credibility (after his client had lost much of it by offering inconsistent explanations for that night's events) through a concession that the state's physical evidence revealed that his client shot Mr. Reynolds. But importantly, after making several evidentiary concessions, counsel then ended his opening statement by focusing the jury on the one element counsel thought that the otherwise damning physical evidence would not establish—namely, that his client *intended* to kill Mr. Reynolds. The Indiana Court of Appeals reasonably concluded that this strategy was not a concession of reasonable doubt. Moreover, contrary to Mr. Frentz's position, it is reasonable to conclude so, because his trial counsel was clearly attempting to convey to the jury that the evidence would not show that his client, Mr. Frentz, knowingly and intentionally killed Mr. Reynolds.[1] Not only is it

---

[1] The fact that the Indiana Court of Appeals reasonably concluded that Mr. Frentz's counsel's opening statement did not amount to a concession that reasonable doubt was lacking makes it unnecessary for the Court to address the parties'

13

reasonable not to view this as a concession of reasonable doubt, it can reasonably be considered by the Indiana Court of Appeals as an adequate trial strategy under the circumstances. *See Foster v. Schomig*, 223 F.3d 626, 638 (7th Cir. 2000) (holding that defense counsel's concession that his client killed the victim did not amount to deficient performance because counsel was obviously "attempting to direct the jury's attention to the intent element, the element on which [the defendant] hoped to prevail," and "[i]t is reasonable to focus a jury's attention on the element which provides the greatest chance of success and [the Seventh Circuit] previously held that this is a sound trial strategy").[2]

"[C]ounsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *See Thomas v. Clements*, 789 F.3d 760, 768 (7th Cir. 2015) (quoting *Pinholster*, 131 S. Ct. at 1403). And here, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The Indiana Court of Appeals's conclusion certainly constitutes a reasonable argument that Mr. Frentz's trial counsel

---

lengthy dispute over whether Mr. Frentz procedurally defaulted a claim based on *United States v. Chronic*, 466 U.S. 648, 656 n.19 (1984), and whether that claim has merit. If, as the Court concludes the Indiana Court of Appeals reasonably determined, the opening statement was not a statement about the reasonable doubt standard at all and was instead a reasonable strategy, Mr. Frentz cannot show that his counsel failed to "hold the prosecution to its heavy burden of proof beyond a reasonable doubt," as is required to prove a *Chronic* claim. *Id.*

[2] Mr. Frentz argues that his counsel's strategy could not have been reasonable given that there was no lesser included offense that his counsel was admitting to. The Seventh Circuit has held that, when there is such an offense, it can be a reasonable strategy to admit guilt regarding the lesser included offense in an attempt to acquire an acquittal on the more serious offense. *See Rodriguez v. United States*, 286 F.3d 972, 986 (7th Cir. 2002); *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991). But such a strategy is not reasonable only when counsel is admitting to a lesser included offense. Indeed, counsel's strategy here is arguably less severe in that counsel did not admit guilt to *any* offense; he admitted that most of the State's facts were true but focused the jury's attention to the one element he wished to contest—namely, intent. The Seventh Circuit has made clear that this too can be a reasonable strategy. *See Foster*, 223 F.3d at 638.

met *Strickland*'s deferential standard in that his opening statement—including his 99.9% comment—did not constitute deficient performance. For this reason, Mr. Frentz is not entitled to habeas relief on this claim, and the Court need not reach *Strickland*'s prejudice prong.

### B. <u>Counsel's Failure to Raise the Insanity Defense</u>

Mr. Frentz argues that his trial counsel provided ineffective assistance by failing to raise the insanity defense at trial. The Indiana Court of Appeals addressed Mr. Frentz's claim on the merits, and it is therefore subject to review pursuant to AEDPA. In rejecting Mr. Frentz's claim, the Indiana Court of Appeals applied the *Strickland* standard governing ineffective assistance of counsel claims, reasoning as follows:

> "The decision to interpose the insanity defense is a matter which requires trial counsel to exercise his professional skills and judgment. Trial counsel's decision not to raise the insanity defense is a matter of strategy and does not support a claim of ineffective assistance of counsel." *Osborne v. State*, 481 N.E.2d 376, 380 (Ind.1985).
>
> Notably, Frentz acknowledges that his trial counsel did file a Notice of Defense of Mental Disease or Defect at the outset of the proceedings and that he investigated the potential for this defense. As the post-conviction court found: "Counsel . . . did investigate the defense of not guilty by reason of insanity but after litigating the issue through pre-trial pleadings and hearings made a strategic decision that it was not in [Frentz's] best interest[s] to pursue that defense." In particular, Frentz's trial counsel had Frentz evaluated by Dr. Phillip Coons. Frentz's trial counsel made the strategic decision not to pursue the defense shortly thereafter.
>
> At the evidentiary hearing before the post-conviction court, Frentz presented the testimony of Dr. Ned Masbaum in support of his position that he was insane when he murdered Reynolds. According to the post-conviction court:
>
> 66. Dr. Masbaum testified that he interviewed [Frentz] for approximately two hours nearly five years after the date of the charging information[ ].
>
> 67. Dr. Masbaum also testified that [Frentz] was the only person he interviewed and that he had not reviewed the reports of the lead detectives, Mike Dixon and Bill Flick.
>
> 68. Dr. Masbaum concluded that [Frentz] "was of unsound mind at the time of the Offenses" based upon a diagnosis of delirium tremens.

\* \* \*

> 89. Dr. M[a]sbaum testified that he had reviewed various documents related to the case, including the probable cause affidavit and Mr. Frentz's medical records. He also admitted that he did not meet with or examine Mr. Frentz near the time of the killing or arrest, he did not review all relevant documents and he did not interview all knowledgeable witnesses or review their testimony.
>
> 90. Dr. M[a]sbaum testified that, to a reasonable degree of medical certainty, Mr. Frentz had been insane on the night of the shooting of Zack Reynolds.
>
> 91. Dr. M[a]sbaum's conclusion was based upon selective and incomplete information.
>
> 92. [Frentz] has failed to show a "reasonable probability" . . . that the result of the proceeding would have been different . . . .
>
> On appeal from the post-conviction court's judgment, Frentz asserts that Dr. Masbaum's testimony demonstrates that his trial counsel should have continued to pursue an insanity defense through trial. Frentz further notes that his trial counsel testified to the post-conviction court that he could not recall the strategic reason for why the Notice of Defense was withdrawn.
>
> Frentz's arguments on this issue are merely requests for this court to reweigh the evidence, which, again, we will not do. The post-conviction court discredited Dr. Masbaum's testimony because his conclusions were "based upon selective and incomplete information," and the court was not persuaded by Frentz's counsel's failure to recall the strategy for not pursuing an insanity defense. Moreover, Frentz presented no evidence to the post-conviction court to demonstrate that the information available to his trial counsel at the time of trial showed that Frentz met the statutory criteria for this defense. Thus, Frentz cannot demonstrate that the post-conviction court erred when it denied his petition on this issue.

*Frentz II*, 2013 WL 2405197, at \*7-8 (citations omitted).

Like his first ineffective assistance of counsel claim, Mr. Frentz challenges the Indiana Court of Appeals's decision under both § 2254(d)(1) and (d)(2). The Court turns first to Mr. Frentz's argument that the Indiana Court of Appeals made an unreasonable determination of the facts in light of the evidence presented, and then will address his argument that it unreasonably applied the *Strickland* standard.

### 1.     The State Court's Factual Determination — § 2254(d)(2)

Mr. Frentz contends that the Indiana Court of Appeals made an unreasonable determination of the facts when it agreed with the post-conviction court's discrediting of Dr. Masbaum's testimony "because his conclusions were 'based upon selective and incomplete information.'" (Filing No. 19 at 18 (quoting *Frentz II*, 2013 WL 2405197, at *8)).  To prove this, Mr. Frentz points out that Dr. Masbaum was declared an expert without objection and that he testified that the materials on which he relied were of the type on which a person in his profession would typically rely to render an opinion in a case.

The state court findings of fact made in the course of deciding an ineffectiveness claim are questions of fact, subject to the "presumption of correctness."  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see Strickland*, 466 U.S. at 698 (noting that a federal habeas court must defer to "state court findings of fact made in the course of deciding an ineffectiveness claim").

The flaw with Mr. Frentz's § 2254(d)(2) argument is that he fails to explain precisely how the Indiana Court of Appeals's conclusion that Dr. Masbaum's opinion was based upon selective and incomplete information was unreasonable.  As the Indiana Court of Appeals noted, Dr. Masbaum testified that he interviewed Mr. Frentz—for only two hours nearly five years after he was charged—and that he did not review the reports of the lead detectives.  *See Frentz II*, 2013 WL 2405197, at *8.  This undisputed fact alone is enough to show that it was not unreasonable for the Indiana Court of Appeals to conclude that Dr. Masbaum's opinion was based on selective and incomplete information.  While Mr. Frentz points the Court to facts that bolster the reliability of Dr. Masbaum's opinion—that he was an expert witness and relied on materials those in his profession typically do—it was not unreasonable for the Indiana Court of Appeals to accept the post-conviction court's discounting of Dr. Masbaum's testimony based on the fact that he failed

to review the lead detectives reports or interview anyone other than Mr. Frentz himself, and did so five years after the events in question. Accordingly, Mr. Frentz § 2254(d)(2) challenge fails, as the Indiana Court of Appeals's determination of the fact was not unreasonable in light of the evidence before it.

## 2. The State Court's Application of Strickland — § 2254(d)(1)

Mr. Frentz argues that the Indiana Court of Appeals unreasonably applied *Strickland* in concluding that his trial counsel made a strategic decision not to raise the insanity defense and thus did not provide deficient performance. The deficient performance prong is met, says Mr. Frentz, solely because his trial counsel testified during the post-conviction proceeding that he believed the insanity defense should have been pursued. According to Mr. Frentz, "[t]rial counsel's "admission establishes the first prong of . . . *Strickland*." (Filing No. 19 at 21.)

"The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding*, 380 F.3d at 1043. Mr. Frentz has failed to carry his burden. His sole argument is based upon his trial counsel's subjective testimony that the insanity defense should have been pursued. But as explained above, *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110. This case provides an apt example of why this is the appropriate inquiry—namely, because "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Id.* Mr. Frentz has only offered his trial counsel's after-the-fact assessment of whether the insanity defense should have been pursued, which is insufficient to demonstrate that the failure to pursue it amounts

to deficient performance.  For this reason alone, Mr. Frentz has failed to carry his burden to show that the Indiana Court of Appeals unreasonably applied *Strickland*.

Mr. Frentz's failure means that he has not undermined the Indiana Court of Appeals's conclusion that his "trial counsel made the strategic decision not to pursue the [insanity] defense." *Frentz II*, 2013 WL 2405197, at *8.  This conclusion was based, at least in part, on the fact that Mr. Frentz's trial counsel filed a notice of insanity defense at the outset of the proceedings, but once Mr. Frentz was evaluated by a doctor, the defense was withdrawn.  Such an analysis of counsel's actual conduct—that is, his investigation of the defense and subsequent withdrawal of it—is in accord with the principle that *Strickland* requires an objective inquiry into the reasonableness of counsel's conduct.  *See Harrington*, 562 U.S. at 110.  Simply put, the Indiana Court of Appeals evaluated trial counsel's conduct and concluded that it revealed a strategic decision to not pursue the insanity defense.  Without absence to the contrary, counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Thomas*, 789 F.3d at 768 (quoting *Pinholster*, 131 S. Ct. at 1403).

For these reasons, Mr. Frentz has failed to demonstrate that the Indiana Court of Appeals unreasonably concluded that his trial counsel rendered adequate performance.  Because his claim fails at the first prong of the *Strickland* analysis, the Court need not evaluate the parties' arguments regarding the prejudice prong.[3]

---

[3] The Court notes that, given that the state court reasonably discounted Dr. Masbaum's assessment of Mr. Frentz—which is the only evidence on which Mr. Frentz relies to establish prejudice—he has not marshalled the evidence necessary to establish the prejudice prong.

## IV.  CONCLUSION

This Court has carefully reviewed the state court record in light of Mr. Frentz's claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits.  Because Mr. Frentz failed to carry his burden on both of his ineffective assistance of counsel claims, he is not entitled to habeas relief, and his petition is therefore **DENIED.**

Judgment consistent with this Entry shall now issue.

## V.  CERTIFICATE OF APPEALABILITY

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2254 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Mr. Frentz has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Court therefore **DENIES** a certificate of appealability.

**SO ORDERED.**

Date: 10/5/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mark Small
Attorney at Law
marksmall2001@yahoo.com

Henry A. Flores, Jr.
OFFICE OF THE INDIANA ATTORNEY GENERAL
henry.flores@atg.in.gov